IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Carleton E. Averill, II,                                            Case No. 3:06CV2867

        Plaintiff

    v.                                                               ORDER

Gleaner Life Insurance Society, et al.,

        Defendant

       This case is about retirement benefits. Plaintiff, Carlton E. Averill, a former insurance agent for defendant Gleaner Life Insurance Society [Gleaner], alleges that Gleaner breached its contract with regard to his retirement benefits. Jurisdiction exists pursuant to 28 U.S.C. § 1332.

       After the parties filed cross-motions for summary judgment [Docs. 53, 55] and Averill filed a motion to compel discovery [Doc. 53], I referred this case to Magistrate Judge Benita Y. Pearson. The Magistrate Judge filed a Report and Recommendation [Report] [Doc. 61] recommending that I deny both parties' motions for summary judgment and grant Averill's motion to compel discovery.

       Gleaner objects to the Magistrate's Report [Doc. 62]. I overrule Gleaner's objections, in part, denying both parties' motions for summary judgment and denying Averill's motion to compel discovery.

1

**Background**

Gleaner is a Michigan-based fraternal benefit society providing financial protection, fraternal benefits, and volunteer opportunities to its certificate holders. From 1985 to 2007, Averill worked as an independent contractor selling insurance for Gleaner.

In 1988, Gleaner established the Gleaner Supplemental Savings Program [GSSP] as a tax-exempt retirement benefits plan pursuant to § 457(e)(12) of the Internal Revenue Code [1988 GSSP]. Section 457(e)(12) excludes employer contributions to non-elective deferred compensation plans from taxation if the plan includes, without individual variation, all individuals with equal relationships to the payor.

The 1988 GSSP did not specify which actuarial assumption to use when valuing the alternative forms of benefit payments. It did not restrict participants' right to receive their entire benefit in a single lump sum payment.[1]

The 1988 GSSP included Article 4, which states:

> The Board of Directors reserves the right to modify or to amend, in whole or in part, or to terminate, this Program at any time. However, no modification, amendment or termination of the Program shall *adversely affect* the right of any Member to receive the *benefits credited* under the Program by the Board of Directors with respect to such Member.

[Doc. 54, Ex. 1] [Emphasis supplied].

---

[1] § 3.06. Prior to the benefit commencement date, the Member shall make an irrevocable election to receive his benefit either:

> (a) as a single lump sum payment;
> (b) by the purchase of an annuity which provides for payments over the lifetime of the Member and/or his contingent annuitant in any form as may be available from an insurance company; or
> (c) in the form of installments over a period not to exceed the combined life expectancy of the Member and his beneficiary, if any. [Doc. 54, Ex. 1]

In 1993, Gleaner amended the GSSP [1993 GSSP]. Among other modifications, the 1993 GSSP restricted participants from receiving benefits in a single lump sum if their benefits exceeded $3,500.[2] For such lump sum payouts, the 1993 GSSP applied an interest rate tied to the Pension Benefit Guaranty Corporation [PBGC]. For all other payouts, the 1993 GSSP required the equivalent actuarial value to be computed with an interest rate of 9.0%. Article 4 of the 1993 GSSP remained nearly identical to its 1988 counterpart; it only varied by substituting the word "Program" for "Plan."

Gleaner further amended the GSSP in 1998 [Amendment I] and 1999 [Amendment II] in ways immaterial to the present dispute.

In 2005, Gleaner conducted a review of the GSSP. Based on limited legal precedent interpreting § 457 and discussions with representatives of the Internal Revenue Service [IRS], it determined that the IRS could conclude that the GSSP was outside the scope of § 457; accordingly, its beneficiaries could owe taxes on accrued benefits in addition to penalties and interest.

Based on this finding, Gleaner amended and terminated the GSSP [Amendment 2005-1 or GSSP Termination]. The new GSSP stated that in the event of a GSSP Termination, it lifted its prior restriction on participants receiving benefits in excess of $3,500 in a single lump sum. It also

---

[2] § 1.09. "Equivalent Actuarial Value" shall mean the equivalent value of a Member's Accrued Benefit payable in a form of benefit other than a 10-year certain and life annuity or at a date other than the Member's Normal Retirement Date. Such Equivalent Actuarial Value shall be computed on the basis of the UP-1984 Mortality Table and interest at the rate of 9% per year, compounded annually. However, if the Participant receives a single sum payment, the Equivalent Actuarial Value shall be no less than the amount determined by using an interest rate which would be used by the Pension Benefit Guaranty Corporation for valuing immediate or deferred annuities, whichever is applicable, for single employer plans that terminate on the first day of the Program Year in which payments commence. [Doc. 54, Ex. 2].

specified that the present equivalent actuarial value should be calculated with an interest rate of 8.5%. The GSSP Termination, in pertinent part, states:

> Upon termination of the Plan by action of the Board of Directors, all benefits payable under the Plan shall be paid to Members . . . in the form of a *single sum distribution* as soon as administratively possible. For purposes of determining the amount of the single sum payment owing to a Member . . . upon termination of the Plan, the Member's Accrued Benefit shall be converted to a single sum payment using the 1994 Group Annuity Mortality table (Male/Female) and an interest rate of *eight and one-half percent per year*, compounded annually. A Member, . . . who is paid the single sum value of the Member's Accrued benefit determined in accordance with this Article shall have no further claim for Plan benefits against the Plan or against Gleaner Life Insurance Society.

[Doc. 54, Ex. 5] [Emphasis supplied].

After terminating the GSSP, Gleaner distributed a portion of accrued benefits to each beneficiary. Gleaner paid Averill a single lump sum of $68,140.97.[3] To arrive at this figure, it valued the present actuarial value of Averill's future interest in $3,931.91 per month for life, ten years guaranteed. For this determination, it assumed an interest rate of 8.5%.

Gleaner, additionally, offered a supplemental payment of approximately $60,000 in exchange for a release of potential claims against Gleaner. Averill rejected this supplemental payment.

## Procedural History

On November 29, 2006, Averill brought this suit against Gleaner, asserting nine causes of action. On January 29, 2008, I dismissed all causes of action with prejudice except for Averill's claim for breach of contract. I also granted the parties leave to conduct further discovery.

In a settlement conference on January 28, 2008, I fashioned a new scheduling order giving the parties the opportunity to discover and present proof on the issue of whether Gleaner used an

---

[3] Averill had contributed $47,182.91 to his retirement benefits.

appropriate interest rate and whether it adversely affected Averill's rights in violation of Article 4.

On May 22, 2008, the parties filed cross-motions for summary judgment and oppositions. Averill requested a ruling with regard to damages only; as an alternative to summary judgment, he moved to compel discovery. Gleaner, in addition to summary judgment, sought costs, fees, and other appropriate relief.

In accordance with 28 U.S.C. § 636(b)(1)(B), I referred this case to Magistrate Pearson. The Magistrate's Report [Doc. 61] recommended that I deny both parties' motions for summary judgment, but grant Averill's motion to compel discovery. Gleaner filed timely objections to the Magistrate's Report [Doc. 62], which Averill Opposed [Doc. 64], and Gleaner Replied [Doc. 65].

**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**1. Standard of Review**

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id*. at 323. The burden shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 250 (1986) (quoting FED.R.CIV.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of concrete evidentiary material in support of its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the non-moving party, all evidence will be construed in the light most favorable to the non-moving party, and all inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law. *Celotex*, *supra*, 477 U.S. at 323.

The standard of review for cross-motions for summary judgment does not differ from the standard when one party files such a motion. *Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991). "[T]hat both parties have moved for summary judgment does not mean that the court must grant summary judgment as a matter of law for one side or the other." *Morr v. Kamco Indus., Inc.*, 548 F.Supp.2d 472, 477 (N.D.Ohio 2008).

In a contract dispute, summary judgment is permissible when the contractual language of the contract is unambiguous, or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits contract interpretation of the agreement as a matter of law. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

I review the Magistrate's decisions as to dispositive motions, such as a motion for summary judgment, de novo. 28 U.S.C. § 636(b)(1)(A); *United States v. Raddatz*, 447 U.S. 667, 674 (1980).

### 2. Michigan Law: Breach of Contract and Contract Interpretation

To state a claim for breach of contract under Michigan law,[4] the plaintiff must first establish the existence of a valid contract. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (Mich. Ct. App. 1990) (delineating the elements of a valid contract: parties competent to contract; proper subject matter; legal consideration; mutuality of agreement; and mutuality of obligation). Once the plaintiff establishes the existence of a contract, he must then establish: 1) the contract's terms; 2) that the defendant breached the contract; and 3) that the defendant's breach caused the plaintiff's injury. *Id*.

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." *Rasheed v. Chrysler Corp*., 517 N.W.2d 19, 29 (Mich. 1994).

Whether a contract is ambiguous is a legal question. *Rainbow Nails Enter. Inc. v. Maybelline, Inc*., 93 F.Supp. 2d 808, 820 (E.D.Mich. 2000); *Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist*., 550 N.W.2d 228, 237 (Mich. 1996) (stating that if a contract is "clear and unambiguous," then "its meaning is a question of law").

"[I]f a contract, even an in artfully worded or clumsily arranged contract, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." *Mich. Twp. Participating Plan v. Pavolich*, 591 N.W.2d 325, 328 (Mich Ct. App. 1998).

In such instances, courts apply the contract's terms in their "plain, ordinary, and popular sense," *Mich. Mut. Ins. Co. v. Dowell*, 514 N.W.2d 185, 188 (Mich. Ct. App. 1994), and do not

---

[4] Section 5.07 of the 1988 GSSP provides that the "Plan shall be construed, regulated, and administered under the laws of the state of Michigan." [Doc. 54, Ex. 1]. The parties do not dispute choice of law.

7

examine "extrinsic" evidence. *Sheldon-Seatz, Inc. v. Coles*, 29 N.W.2d 832, 834-35 (Mich. 1947). A contract is not ambiguous simply because a relevant term is not defined; instead, courts should interpret the words in a contract according to common usage. *Henderson v. State Farm Fire & Cas. Co.*, 596 N.W.2d 190, 194 (Mich. 1999).

A contract, conversely, is ambiguous if "its words may reasonably be understood in different ways." *Raska v. Farm Bureau Ins. Co.*, 314 N.W.2d 440, 441 (Mich. 1982). When presented with an ambiguous contract, courts may examine extrinsic evidence to ascertain the parties' intent and meaning. *Averill v. Gleaner Life Ins. Soc.*, 2008 WL 269533, * 1 (N.D. Ohio) ("[W]here a contract's terms are ambiguous, parol evidence may resolve the ambiguity and ascertain the intention of the parties."). However, any ambiguity in the language must be construed against the contract's drafter. *United Rentals (North America), Inc. v. Keizer*, 355 F.3d 399, 409 (6th Cir. 2004).[5]

If the extrinsic evidence only supports one interpretation, summary judgment may be proper. *Id*. at 409-10. If the contract remains ambiguous, then the intent of the parties becomes a question of fact for a jury. *Manley v. Plasti-Line*, *Inc*., 808 F.2d 468, 471 (6th Cir. 1987) ("[D]isputed questions of contractual intent are considered factual issues which are precluded from summary

---

[5]

Section 5.06 of the 1988 GSSP states: "The administration of the Program, the exclusive power to interpret it, and the responsibility for carrying out its provisions are vested in the committee that is also responsible for the Retirement Plan." [Doc. 54, Ex. 1].

In light of this provision, Gleaner argues that I should review its interpretation of the GSSP under an arbitrary and capricious standard. If ERISA regulated this claim, Gleaner might be correct. *See Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996) (noting that under ERISA, when a plan administrator has discretionary authority to determine benefits, courts review a decision to deny benefits under "the highly deferential arbitrary and capricious standard of review" as opposed to the less deferential de novo standard). Given that Averill's pending claim is one for breach of contract, and not ERISA, I see no reason to apply the more deferential standard applicable to claims arising under ERISA.

resolution."); *Klapp v. United Ins. Group Agency*, *Inc*., 663 N.W.2d 447, 453-54 (Mich. 2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury.").

## Discussion

The parties do not dispute the validity of the contract. They instead dispute the meaning and application of Article 4. Averill claims Gleaner breached Article 4 by modifying and terminating the GSSP in a manner that adversely affected his benefits. Gleaner contends that it did not breach the contract and seeks an order declaring such.

For the reasons discussed below, I find the GSSP series to be ambiguous in its language and application, precluding me from deciding this case, for either party, as a matter of law.

### 1. The Text of Article 4 is Ambiguous

Averill construes Article 4 broadly. He contends that by using the word "benefits," the parties intended to convey the broadest class of things advantageous to him. He asserts that the word benefit describes more than a right to receive a certain amount of money, but also includes advantages such as cost of living adjustments, assumptions with respect to variations of those entitlements, and options to elect payment as a single sum. Basing his contract clam on this theory, Averill asserts that aspects of the subsequent GSSP amendments run afoul of Article 4 and thus are of no effect.

Averill's interpretation of Article 4 is reasonable. The word benefit is not defined in the 1988 GSSP, but its common usage conveys its breadth. Black's Law Dictionary defines "benefit" as an "advantage; privilege" or a "profit or gain," Black's Law Dictionary (8th ed. 2004). The American Heritage Dictionary defines "benefit" as "something that promotes or enhances a well-being; an

9

advantage." The American Heritage Dictionary of the English Language: Fourth Edition. 2000. Averill correctly contends that the word "benefit" is typically broad.

This is especially so in light of the GSSP's other usages of the word "benefits." The 1988 GSSP refers to and defines "accrued benefits." Article 4, however, refers to "benefits," not "accrued benefits." As such, Averill's argument that the parties intended benefits to be broader than accrued benefits is reasonable.

Gleaner, conversely, argues that Article 4 only prohibits changes adversely affecting benefits that the Board of Directors already recognized as attributed to participants. It asserts that the benefits referenced in Article 4 are "accrued benefits," or in other words, benefits that have already been earned as of the time in question.

I also find Gleaner's interpretation to be reasonable. Article 4 uses the phrase "benefits credited," a phrase at odds with a broad definition. The American Heritage Dictionary defines "credited" as "To ascribe to a person; attribute," "To enter as a credit," and "To make a credit entry in." Given this common usage, the phrase "benefits credited" could reasonably be understood as only benefits that have already been ascribed or attributed to a person.

Moreover, when Article 4 is read in conjunction with the GSSP summary, dated 1993, Gleaner's interpretation appears even more reasonable. Page 15 of the GSSP summary asks: "Can I lose, be denied, or have expected benefits reduced?" The summary responds: "Yes. Loss, denial, or reduction of expected benefits can result from the following: . . .  4. If the program terminates . . .  6. If the Society amends the Program." [Doc. 62-4].

I find the text of Article 4 ambiguous as a matter of law because it can be reasonably interpreted in two ways. As such, it is inappropriate for me to find for either party as a matter of law.

10

**2. The Application of Article 4 is Ambiguous**

Applying Article 4 to the GSSP series leads to inconsistent and irreconcilable results. This is especially so when applying Article 4 to determine the appropriate interest rate to calculate the present value of Averill's accrued benefit, the central issue in this case.

Averill contends that Gleaner should have applied a 2.0% interest rate,[6] calculated by taking a base interest rate of 4.0%, and then reducing it by a 2.0% cost of living adjustment. Gleaner argues that its use of an 8.5% interest rate was lawful, as the GSSP authorized it to apply a 9.0% interest rate.[7]

With regard to the base interest rate, Averill relies on § 1.09 of the 1993 GSSP. This section states that the appropriate interest rate to calculate lump sum payments is tied to the PBGC. The PBGC's rate on January 1, 2005, the first date of the Program Year in which payments commence, was 4.0%. Averill, therefore, contends that 4.0% is the appropriate base interest rate.

The 2005-Amendments, however, state that the appropriate interest rate is 8.5%. Averill contends that this is provision is unenforceable because it adversely affects his benefits in violation of Article 4.

Gleaner disagrees, contending that Averill never had a right to interest rates tied to the PBGC. Section 1.09 of the 1993 GSSP specifies two interest rates. It specifies an interest rate tied

---

[6] According to Averill's expert, the actual present value of his accrued benefit as of January 1, 2005, using 2.0% instead of 8.5% is $485,696.58.

[7] As noted by the Magistrate: "Because the lump sum payout represents the Present Value of a future amount, the lower interest rate yields a higher payment. Put differently, "the higher the interest rate the lower the amount of money needed now [by Gleaner] to achieve that future amount." [Doc. 61, p. 11].

11

to the PBGC when participants receive lump sum payments, and an interest rate of 9.0% when participants do not. Notably, however, the 1993 GSSP capped lump sum payments at $3,500.

Gleaner contends that because Averill's payment exceeds $3,500, it lawfully could apply a 9.0% interest rate. Because the 2005-Amendment's interest rate of 8.5% is less than 9.0%, Gleaner argues that it did not violate Article 4.

This is exactly the type of dispute that is inappropriate for summary judgment. Both parties point to one provision to support their contention. Both parties' arguments are reasonable, as the provision could be read in two ways. As Gleaner suggests, § 1.09 could mean that the PBGC's interest rate applied only to benefits under $3,500; or, as Averill asserts, § 1.09 could mean that the PBGC's interest rate applied to all single lump sum payments.

This is so because in 1993, all lump sum payments were under $3,500. The GSSPs did not authorize lump sum distributions over $3,500 until 2005. As such, I do not know as a matter of law whether the parties intended the PBGC's interest rate to apply to lump sum payments or to payments under $3,500, as in 1993, the two were one in the same.

Gleaner also emphasizes that the GSSP has never applied the § 417(e)(3) actuarial assumptions to a single sum distribution in excess of $3,500. This contention is off the mark, however, because the previous GSSPs did not authorize single lump sum distributions over $3,500. Again, this only serves to highlight the inappropriate posture of summary judgment.

Gleaner also asserts that because the 1988 GSSP did not specify any actuarial assumptions, it could use "any reasonable actuarial assumption." [Doc. 62]. Much of Gleaner's argument relies on its expert to establish that a rate of 9.0% is reasonable.

I disagree. Nothing in the GSSP series authorizes an expert to determine the appropriate interest rate. The GSSP series, instead, either specifies an interest rate, remains silent, or ties the rate to an entity like the PBGC. Gleaner has not produced evidence that the parties intended to use any reasonable actuarial assumption.

Moreover, the ambiguous breadth of Article 4 precludes me from applying it as a matter of law to other GSSP terms. With regard to the cost of living adjustment, Averill contends that Gleaner should have reduced the base interest rate of 4.0% by a 2.0% cost of living adjustment for a total of 2.0%. The 1988 GSSP included this provision while the subsequent GSSPs did not. Averill asserts that by eliminating the cost of living reduction, Gleaner adversely affected his benefits in violation of Article 4. Whether the right to a cost of living adjustment is a benefit or an accrued benefit depends on the breadth of the interpretation of a benefit.

Likewise, a question remains as to whether Gleaner had the right to impose the 1993 restrictions on single lump sum benefits. In 1988, Averill had the right to elect a single lump sum payment without restriction, and he contends that this is a benefit which cannot be eliminated. Whether the 1993 restrictions on electing a single lump sum are valid also depends on the breadth of the word benefit.

For the reasons previously discussed, the text of Article 4 is ambiguous as to the point. Based on the foregoing, I deny both parties' motions for summary judgment.

## MOTION TO COMPEL

### Standard of Review

When reviewing "nondispositive" motions decided by the Magistrate, such as a motion to compel, I apply a "clearly erroneous or contrary to law" standard of review. 28 U.S.C. § 636(b)(1)(A); *Raddatz*, *supra*, 447 U.S. at 673.

## Discussion

According to FED.R.CIV.P. 26(b)(1), parties may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." If one party fails to comply with discovery requests, the other party may seek a motion to compel. FED.R.CIV.P. 37(a)(1).

Although parties must produce information necessary to establish claims, courts should not permit them "to go fishing." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (internal citations omitted). As such, courts retain discretion to determine if a discovery request is too broad or oppressive. *Id.*

On April 17, 2007, Averill filed the following production requests:

REQUEST FOR PRODUCTION NO. 1:
Produce all documents relating or referring to or evidencing communication related to communication *between or among* Gleaner Board members of officers related to the termination of the GSSP.

REQUEST FOR PRODUCTION NO. 2:
Produce all documents relating or referring to or evidencing communication *between or among* Gleaner Board members of officers related to Amendment No. 2005-1 to the GSSP.

[Doc. 53] [Emphasis supplied].

Gleaner responded on May 11, 2007. It, however, produced zero documents pertaining to these two requests.

As evidence that Gleaner breached its discovery obligations, Averill points to an email chain that Gleaner failed to produce. This email, which Jeffrey Rose of Buck Consultants produced for

15

Averill, was in regard to a conversation about interest rate assumptions that he had with members of Gleaner's Board of Directors.

Gleaner explains that it did not produce these emails because Averill's production request did not require their production. Because Rose is not a Gleaner Board member or officer, Gleaner contends that this email dialogue falls outside the scope of Averill's request. I agree.

Averill's request was insufficiently broad to include correspondence with third parties. The phrase "between or among" reasonably refers only to intra-Board communications  and thus, Gleaner was not required to produce an email like the one produced by Rose. Averill could have drafted a production request seeking correspondence between Gleaner's Board of Directors, officers, and third parties, but he failed to do so.

Averill, furthermore, asserts that even if "between or among" is too narrow to include emails like the one produced by Rose, Gleaner still breached its discovery obligations. This is so because Gleaner must have documents evidencing communication detailing such an important business decision.

Such an assertion is insufficient to warrant a motion to compel. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 219 F.R.D. 12, 17 (D.D.C. 2003) ("The federal courts are often confronted with a party's complaint that its opponent must have documents that it claims not to have. Such suspicion is, however, insufficient to warrant granting a motion to compel.").

Gleaner states that "it does not believe that there are other such additional messages, but it will make a diligent search in any event." [Doc. 62]. By representing that it has or will produce all required messages, I have no need to compel discovery. *See Anderson v. Dillard's*, *Inc*., 251 F.R.D. 307, 310 (W.D.Tenn. 2008) (finding that based on party's "representation to the court that

16

documents responsive to this request either do not exist or have already been produced to plaintiffs, the motion to compel with respect to this request is denied").

For these reasons, I find the Magistrate's recommendation ordering Gleaner to produce Averill's requested records clearly erroneous.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT:

1. Defendant's motion for summary judgment is denied;

2. Plaintiff's motion for summary judgment is denied; and

3. Plaintiff's motion to compel discovery is denied.

4. A pretrial conference is scheduled for June 29, 2009 at 11:30 a.m.

So ordered.

                                                                     s/James G. Carr
                                                                     James G. Carr
                                                                     Chief Judge